**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

             **Plaintiff,**

                                          **14-CR-79A**

      **-v-**

**JEFFREY COLEMAN,**

             **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report on dispositive motions.

## PRELIMINARY STATEMENT

        The defendant, Jeffrey Coleman ("the defendant"), is charged in an indictment, along with co-defendant Steven Martinez ("the co-defendant") and others with having violated Title 21 U.S.C. §§ 841(a)(1), 846 and 856(a)(1).  Dkt. #16.  He has filed a motion seeking to suppress the use of evidence at trial seized from him on February 26, 2014, claiming that the search in question "was the product of an illegal detention of the defendant and was conducted in the absence of probable cause and without the voluntary consent of the defendant."  Dkt. #26, pp. 2-3, ¶ 2.  He also seeks suppression of statements attributed to him on the basis that he "was not read [his] Miranda rights until after [he and officers] left the bus station and just as [he] was being

placed in a car." Dkt. #33, p. 3, ¶ 10.  The government has filed a response to these claims of the defendant.  Dkt. #31.


An evidentiary hearing on the issues raised by the defendant was held on May 26, 2015 and a transcript of that proceeding was filed on August 5, 2015.  Dkt. #63. The parties were given thirty days from the date of that filing to file post hearing legal memoranda.  The government filed its memorandum of law on September 8, 2015.  Dkt. #64.  The defendant has late filed a memorandum.  Dkt. #65.  The matter was then take under advisement by this Court.


## FACTS[1]

Prior to February 26, 2014, agents of the DEA, Buffalo Office, were investigating the illegal drug activities of the co-defendant, Steven Martinez, and had received information from a confidential informant "that Martinez's source of supply was coming to Buffalo from the New York City area to deliver approximately 800 grams of heroin." T. 5, 16.  The confidential informant also described the person who would be delivering the drugs as "a black male, bald head, heavier set" and stated that this person "would be in transit to the Buffalo area utilizing the Greyhound Bus service." T. 6, 16-17.  On February 25, 2014, DEA agents obtained a search warrant for Martinez's residence located on Connecticut Street in Buffalo, New York as well as one for his automobile.  T. 5, 7, 24.  The confidential informant also advised the agents of

---

[1] The facts are taken from the transcript of the evidentiary hearing held by this Court on May 26, 2015 and references to same are designated as "T" followed by the appropriate page number(s).

other various locations that were utilized by Martinez "in the trafficking of heroin," including a location on West Delevan Avenue in Buffalo, New York.  T. 6.

On February 26, 2014, while conducting surveillance at the West Delevan location, Martinez was observed in his automobile at that location and the defendant was seen entering Martinez's vehicle.  T. 8-9, 26.  Agent Zimilevich observed the defendant entering Martinez's vehicle and radioed a description of the defendant to the other agents involved in the surveillance operation.  T. 26.  Surveillance of the Martinez vehicle continued as it traveled to the downtown area of Buffalo until "it ultimately stopped near the library downtown on Ellicott Street" where the defendant "exited the vehicle with a wheeled luggage bag."  Surveillance of the defendant continued as he "walked directly to the bus terminal."  T. 9-10, 20.  The confidential informant had advised the agents that Martinez "was to be transporting a drug courier to the bus station" who was described as being a "black male, heavyset, in a green puffy coat."  T. 30, 38.

In the meantime, Detective Cory Higgins directed the other officers to "initiate a traffic stop of Martinez and execute the [search] warrant" for his vehicle.  He also directed the other agents to detain the defendant at the Greyhound Bus station. T. 10, 20.

When the defendant arrived at the bus station, a number of agents took hold of him and he was escorted to the NFTA police office located in the bus terminal

where he was handcuffed by NFTA police officers "because they were afraid that he was going to flee." T. 31-33. At that point, S.A. Sullivan advised the defendant of his rights by reading from his *Miranda*[2] card and then asked the defendant if he understood his rights and if he was willing to answer questions to which the defendant replied "yes." He also asked the defendant if they could search his luggage bag and the defendant stated that they could search it. T. 33, 34-35, 39, 46, 47. He then asked the defendant if there was "anything dangerous in the bag that they needed to know about, any contraband, any bombs, hand grenades, things like that" and the defendant said "no." T. 36.

Detective Zawierucha then took the defendant's luggage bag and conducted a search of it. In doing so, he found "a plastic bag wrapped in a tee shirt and it had three brick type items that were duct taped." T. 47. Having made this find, he yelled out, "We found it." T. 48, 52. Detective Zawierucha opened the three duct taped bricks and observed U.S. currency inside. T. 48. Later it was determined that the currency found amounted to approximately $65,000. A note was also found within the package (Government Exhibit 1) which contained "a series of numbers" and the initial "L." Martinez's nickname is "Lupe." T. 15-16. Previously, when Martinez had been arrested, Detective Higgins had been advised by S.A. Nanna that Martinez had told him that the defendant would not have any heroin in his possession and that "he [the defendant] only had money." T. 14.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966)

## DISCUSSION AND ANALYSIS

### A.  The Seizure Of The Defendant
### And The Search Of His Luggage:

The defendant argues that "the unlawful seizure of [his] person was a violation of his Fourth Amendment rights and his subsequent 'consent' was the direct product of that illegality" and therefore the evidence seized from his luggage must be suppressed from use at his trial.  Dkt. #65, p. 3.  Basically, the defendant argues that the agents lacked probable cause to arrest him and that when he was handcuffed and escorted to the NFTA police office by a number of agents, he was under arrest.  As a result, this illegal detention of the defendant "rendered his consent to search his luggage invalid because it was tainted by his unlawful confinement."  Dkt. #65, p. 4.  For the reasons that follow, this argument is rejected.

A confidential informant, whose reliability had been established from past events, (T. 5-6), had advised the agents in this case that Steven Martinez, the co-defendant herein, "was involved in trafficking heroin in Buffalo (T. 5) and that his "source of supply was coming to Buffalo from the New York City area to deliver approximately 800 grams of heroin."  T. 5, 16.  The confidential informant also provided a description of the person who would be delivering the heroin, to wit, "a black male, bald head, heavier set" who would be "utilizing the Greyhound Bus service."  T. 6, 16-17.  A confidential informant also advised that Martinez would "be transporting a drug courier to the [Greyhound] bus station."  T. 38.

In the afternoon of February 26, 2014, the confidential informant advised Detective Cory Higgins, a member of the DEA Federal Task Force, that "Martinez was on his way at that time to go meet with [his] source of supply." T. 7. Since Martinez had been under surveillance by agents, as were locations "utilized [by him] in the trafficking of heroin (T. 6-7), he was observed leaving his "residence on Connecticut Street" (T. 8) and surveilled to a location on West Delevan that had been described by the confidential informant as one of Martinez's drug houses. T. 6-7. At the West Delevan location, an individual matching the description given by the confidential informant of the drug courier from the New York City area, was observed entering Martinez's automobile. T. 8-9, 26. This vehicle with Martinez and his drug courier passenger inside, were followed until "it ultimately stopped near the library downtown on Ellicott Street" and the passenger (the defendant) "exited the vehicle with a wheeled luggage bag." Surveillance was maintained on the defendant while he "walked directly to the [Greyhound] bus terminal."[3]  T. 9-10, 20. Admittedly, when the defendant entered the bus station and was confronted by a number of agents and taken to the NFTA police office and handcuffed, he was in custody. However, considering the totality of the circumstances described above, the agents had sufficient legal probable cause to arrest the defendant for his alleged involvement in drug trafficking with Martinez.

The information given by the confidential informant, including the description of the drug courier, was substantially corroborated by the personal observations of the agents during their surveillance of Martinez and the defendant.

---

[3] This Court takes judicial notice that the downtown public library located at 1 Lafayette Square, Buffalo, New York is two blocks away from the Greyhound Bus station on 181 Ellicott Street.

> The Court's opinion in Gates gave credit to the proposition
> that because an informant is shown to be right about some
> things, he is probably right about other facts that he has
> alleged, including the claim that the object of the tip is
> engaged in criminal activity. 462 U.S., at 244, 103 S.Ct., at
> 2335. Thus, it is not unreasonable to conclude in this case
> that the independent corroboration by the police of
> significant aspects of the informer's predictions imparted
> some degree of reliability to the other allegations made by
> the caller.

*Alabama v. White,* 496 U.S. 325, 331 - 332 (1990).

The totality of the circumstances established in the evidentiary hearing of May 26, 2015 is what must be considered in determining whether probable cause existed for the arrest of the defendant on February 26, 2014 when he entered the bus station.  As the United States Supreme Court has stated:

> This totality-of-the-circumstances approach is far more
> consistent with our prior treatment of probable cause than is
> any rigid demand that specific "tests" be satisfied by every
> informant's tip. Perhaps the central teaching of our decisions
> bearing on the probable cause standard is that it is a
> "practical, nontechnical conception." Brinegar v. United
> States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed.
> 1879 (1949). "In dealing with probable cause, ... as the very
> name implies, we deal with probabilities. These are not
> technical; they are the factual and practical considerations of
> everyday life on which reasonable and prudent men, not
> legal technicians, act." Id., at 175, 69 S.Ct., at 1310.

Illinois v. Gates, 462 U.S. 213, 230 - 231 (1983); *Maryland v. Pringle,* 540 U.S. 366, 370 (2003).

It is also pointed point that these circumstances must be considered from

the perspective of a reasonable police officer in light of his training and experience.

*United States v. Delossantos*, 536 F.3d 155, 159 (2c Cir. 2008).

> Probable cause exists if a law enforcement official, on the
> basis of the totality of the circumstances, has sufficient
> knowledge or reasonably trustworthy information to justify a
> person of reasonable caution in believing that an offense has
> been or is being committed by the person to be arrested."
> Gagnon, 373 F.3d at 236. "[T]he probable-cause standard is
> a practical, nontechnical conception that deals with the
> factual and practical considerations of everyday life on which
> reasonable and prudent men, not legal technicians, act.
> Because the standard is fluid and contextual, a court must
> examine the totality of the circumstances of a given arrest."
> United States v. Delossantos, 536 F.3d 155, 159 (2d
> Cir.2008) (citations and internal quotation marks omitted).

*United States v. Steppello*, 664 F.3d 359, 363 - 364 (2d Cir. 2011).

I observed the demeanor of Detective Higgins, S.A. Sullivan and Detective

Zawierucha during their testimony given in the evidentiary hearing of May 26, 2015 and

find them to be credible witnesses and accept their testimony as to the events of

February 26, 2014.  In doing so, I have taken into account the investigative training and

experience of each witness and, based on their testimony, I find that the totality of the

circumstances described by them was based on "knowledge or reasonably trustworthy

information sufficient to warrant a person of reasonable caution in the belief an offense

has been committed by the person to be arrested" and therefore probable cause existed

for the arrest of the defendant when he entered the bus station.  *United States v.*

*Howard*, 489 F.3d 484, 491 (2d Cir. 2007).

Since the defendant had been legally arrested, his argument that his "consent" to search his luggage was the "direct product" of an illegal arrest thereby requiring suppression of the evidence seized, fails.  The burden of establishing the validity of such "consent to search" is upon the government.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1983); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion).  The fact that the defendant was in custody when he consented to the search of his luggage does not affect the validity of the search since "custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."  *United States v. Watson*, 423 U.S. 411, 424 (1976); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).

The defendant offered no evidence at the evidentiary hearing held on May 26, 2015.  Having found the testimony of the government's witness to be credible, I find that the defendant knowingly and voluntarily consented to the search of his luggage on February 26, 2014 and therefore the evidence retrieved from his luggage was properly obtained.

## B.  Statement Of The Defendant:

The defendant claims in his affidavit in support of his motion to suppress evidence that he "was not read [his] Miranda rights until after [they] left the bus station and just as [he] was being placed in a car."  Dkt. #33, p. 3, ¶ 10.  This claim was refuted by the testimony of Detective Higgins, S.A. Sullivan and Detective Zawierucha. Detective Higgins testified that while the defendant was in the NFTA police office in the

bus terminal, he observed and heard S.A. Sullivan "provide [the defendant] with his Miranda warnings." T. 11-12, 26-27. He further testified that when the defendant "was removed from the bus terminal and placed into a vehicle," he was again given "Miranda warnings" by Task Force Agent Randy Frye. T. 27.

S.A. Sullivan testified that while he and the defendant were in the NFTA police office in the bus terminal, he "advised [the defendant] of his Miranda warnings" by reading from DEA Form 13, a card containing advice of rights and warnings in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966) which the defendant acknowledged he understood. T. 33-34.

Detective Zawierucha testified that he was present in the NFTA police office in the bus terminal when he observed and heard S.A. Sullivan read the "Miranda warnings to the defendant and heard the defendant acknowledge that he understood his rights when asked by S.A. Sullivan." T. 46.

The defendant offered no evidence at the hearing and therefore, the aforesaid testimony of Detective Higgins, S.A. Sullivan and Detective Zawierucha was uncontroverted. As stated earlier, I find the testimony of these three witnesses to be credible and therefore reject the defendant's claim as to when he was advised of his rights.

## CONCLUSION

Therefore, based on the foregoing, it is recommended that the defendant's motion to suppress the use of the evidence at his trial be in all respects denied.

It is hereby **ORDERED** pursuant to 28 U.S.C § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statue, Fed.R.Crim.P. 58(g)(s) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**


DATED:          November 9, 2015
                Buffalo, New York




                                        *S/ H. Kenneth Schroeder, Jr.*
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**